**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

BRIAN CONROY,

          Plaintiff,

    vs.

DELSHAH MANAGEMENT LLC,

        Defendant.

Case No.:  1:22-cv-4021

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Brian Conroy, by and through his attorneys, The Law Office of Christopher Q. Davis, PLLC, alleges upon personal knowledge and information and belief, as follows:

**PRELIMINARY STATEMENT**

1.    Plaintiff Brian Conroy ("Mr. Conroy" or "Plaintiff") brings this action against Defendant Delshah Management LLC ("Delshah" or "Defendant") for damages suffered as a result of violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. ("FLSA"), the New York Labor Law §§ 190 *et seq*.("NYLL"), and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"). In addition, Plaintiff brings disability discrimination claims, seeking monetary and emotional damages, under the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), Admin. Code §§ 8-101 *et seq*.

**JURISDICTION AND VENUE**

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3.    In addition, the Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 29 U.S.C. § 207 *et seq.*

4.      This Court has jurisdiction over Plaintiff's claims under the FMLA pursuant to 29 U.S.C. § 2601 *et seq*.

5.      Venue is proper in the United States District Court, Eastern District of New York pursuant to 28 U.S.C. § 1391, because the wage violations which give rise to Plaintiff's claims occurred in this district.

## PARTIES

6.      Mr. Conroy is a male citizen of the State of New York and currently, and at all relevant times herein, resides Kings County, New York.

7.      From December 23, 2019, to December 17, 2021, Defendant employed Mr. Conroy as a resident building superintendent.

8.      Defendant Delshah maintains a principal place of business at 149 Madison Ave New York, NY 10016.

9.      At all times while Mr. Conroy was employed by Defendant he worked at various apartment buildings, all located in Brooklyn, New York.

## FACTUAL STATEMENT

10.      On December 23, 2019, Mr. Conroy began working as the sole resident building superintendent for Defendant overseeing 26 buildings throughout Brooklyn, New York.

11.      In or around June 2020, Defendant hired a second superintendent, and thereafter, Plaintiff was responsible for overseeing 14 buildings throughout Brooklyn, New York.

12.      During his time working for Defendant, Mr. Conroy had many duties, including but not limited to: communicating regularly with tenants, providing regular building maintenance, overseeing contractors engaged in various projects throughout the buildings, supervising building inspections, assisting with and organizing moving tenants in and out,

providing and overseeing emergency repairs and clean up, and cutting keys for tenants.

13.     Despite having many responsibilities that varied greatly from day-to-day, Mr. Conroy performed all his tasks diligently.

14.     At first, Mr. Conroy's supervisor was Evita Levchenko (correct spelling unknown), who was eventually replaced by Lucrecia Perez.

15.     Thereafter, Defendant hired Arnaldo Alvarado, who directly supervised Mr. Conroy for the remainder of his employment. Mr. Alvarado reported to Ms. Perez.

**Mr. Conroy Works Overtime Without Compensation.**

16.     According to Mr. Conroy's offer letter, he was hired in December 2019 as a salaried employee earning $52,000 per year.

17.     At all relevant times herein, $52,000 was below the overtime salary threshold for executive and administrative exemptions under the NYLL.

18.     Mr. Conroy's regular schedule was Monday through Friday from 8 a.m. to 4 p.m.; however, he regularly worked well beyond his scheduled hours without any additional compensation.

19.     Later in his employment, in or around April 2021, Delshah hired a new payroll company (Prestige) and a representative from Delshah's Human Resources told Mr. Conroy to inform the payroll company that he was paid twenty-five dollars ($25) per hour.

20.     This was the first time Mr. Conroy was informed that his pay was, in fact, supposed to be hourly.

21.     Notably, the $25 per hour rate was the equivalate of the $52,000 per annum salary that was set forth in his offer letter, assuming Mr. Conroy worked exactly 40 hours a week, 52 weeks a year.

22.     At no time did Delshah furnish Mr. Conroy with a wage notice setting forth his pay rate, overtime premium rate, whether his pay was designated for a salaried or hourly employee, or whether he was exempt or non-exempt from overtime requirements.

23.     Nonetheless, as a full-time employee, Mr. Conroy was expected to work at least forty hour per week, but often worked significantly more than 40 hours.

24.     Delshah knew, or should have known, that it was impossible for Mr. Conroy to complete all his duties within a forty-hour workweek.

25.     To complete his regular duties, Mr. Conroy often worked late, came in early, and occasionally, worked through his lunch break.

26.     Depending on the season and whether he was the sole superintendent (*i.e.*, prior to June 2020), Mr. Conroy typically worked between 50 and 60 hours per week.

27.     By way of example, during the week of December 22, 2019, Mr. Conroy worked approximately 60 hours; during the week of February 23, 2020, Mr. Conroy worked approximately 50 hours when, on February 27, 2020, he had to respond to an emergency with a mixing valve at the property at 219 13th Street; during the week of April 19, 2020, Mr. Conroy worked approximately 50 hours when, on the weekend, he had to respond when the boiler burst at the property at 317 Irving Avenue; and during the week of December 6, 2020, Mr. Conroy worked approximately 60 hours when, having to respond to a situation where a pipe burst over a boiler, he worked through the night on December 9, 2020.

28.     Mr. Conroy was not paid any overtime premiums for the overtime hours worked during the above referenced weeks.

29.     These types of building emergencies – some big and some small – were such a frequent occurrence that Mr. Conroy was regularly working beyond his scheduled 40 hours

without compensation.

30.     On each and every week Mr. Conroy worked 5 full days, he worked more than 40 hours because he always worked after his scheduled shift to oversee garbage and recycling removal on Monday, Wednesday, and Friday nights and he always responded to tenant emails and reviewed work orders from home prior to starting his shift.

31.     On these weeks Mr. Conroy worked approximately 10 overtime hours.

32.     If, during one of these weeks, there was also emergency maintenance work (for example a boiler was broken) in any of the buildings Mr. Conroy oversaw, he would work 20 or more overtime hours.

33.     Despite working these overtime hours, Mr. Conroy was never paid any overtime premium for these overtime hours worked.

34.     Additionally, because Mr. Conroy was responsible for 26 (pre-June 2020) or 14 (post-June 2020) apartment buildings located throughout Brooklyn, New York, he was also frequently responding to emails and phones calls from tenants and vendors after hours.

35.     Each time Mr. Conroy answered emails, responded to tenant and vendor phone calls, or provided emergency services outside of his regular schedule, he did so "off the clock" and without compensation.

36.     Mr. Conroy was also responsible for overseeing that the porters in each of the buildings he oversaw to ensure that trash and recycling was properly put out for pick up the evening prior.

37.     This often required Mr. Conroy to work 3 evenings a week driving around from building to building on his vespa to supervise the trash removal procedures.

38.     All of this post-shift work was done off-the-clock and without overtime premium

compensation for overtime hours worked.

39.     Mr. Conroy was frequently in direct communications with his supervisors outside of his scheduled shifts, often updating them directly on work he was doing or, at the very least, cc'ing them on work-related communications after hours.

40.     As such, Delshah management had direct knowledge that Mr. Conroy was working overtime hours without overtime premium compensation.

41.     Despite working more than forty hours per week nearly every week and almost never taking any sick or vacation days off, Mr. Conroy was never compensated with overtime premiums for the overtime hours that he worked and was only compensated for his scheduled 40 hours.

42.     From the start of his employment, Mr. Conroy was required to submit weekly timesheets to his supervisor.

43.     However, at the start of his employment, Ms. Levchenko informed Mr. Conroy that he was a salaried and could not receive overtime, and she therefore directed him to submit his timesheets showing his scheduled hours of 8:00am to 4:00pm, Monday through Friday, regardless of how many hours he actually worked.

44.     Multiple subsequent times during his employment, Ms. Levchenko, Ms. Perez, and Mr. Alvarado all directed Mr. Conroy to simply mark is scheduled hours, not actual hours, on his timesheets.

45.     Mr. Conroy was, at all times during his employment, under the impression that he could not receive overtime premiums for overtime hours worked, so he complied with the directions from his supervisors to report only his scheduled hours.

46.     Because, as set forth above, Mr. Conroy was not provided a wage notice at the

time of hire, he was denied accurate information about his hourly pay rate, hours for which the rate would be paid, overtime rates, regular paydays, exemption status, and allowances taken.

47.     Mr. Conroy was also denied accurate information in his pay statements about his hours worked and overtime rates of pay.

48.     By not providing this information, at the time of hire (wage notice violation) and in his pay statements (wage statement violation), Mr. Conroy was prevented from identifying and correcting the wage theft, in the form of unpaid overtime, which, as set forth herein, occurred during his employment with Defendant.

49.     This wage theft was a concrete downstream consequence of Defendant's failure to provide information required by the WTPA.

50.     Because of Defendant's failure to provide wage notices and accurate wage statements, Plaintiffs had no understanding of whether he was to receive overtime pay for hours worked over 40, and if so, what their overtime rate would be.

51.     Notably, Mr. Conroy's pay statements contained no information on his actual hours worked because it did not reflect off-the-clock hours worked.

**Delshah Interferes with Mr. Conroy's FMLA Rights**

52.     On August 2, 2021, Mr. Conroy was hit by a car while on the job.

53.     The following day, August 3, 2021, Mr. Conroy attempted to return to work and requested light duty work, but Gretchen Grottenthaler, the Company's Director of Human Resources ("HR"), denied that request without any conversation or alternative proposals.

54.     Specifically, Ms. Grottenthaler told Mr. Conroy that if he could not do the full job description, he needed to go out on an unpaid leave after exhausting any paid vacation and paid sick days.

55.     Despite Mr. Conroy being capable of doing many of his job tasks, such as desk work, emails, phone calls, overseeing vendors or other workers, cutting keys, and directing tenants to resources, Mr. Conroy followed Ms. Grottenthaler's instructions to start exhausting his paid vacation and sick days believing that to be his only option.

56.     Mr. Conroy used two-weeks paid vacation and his four remaining paid sick days while he recovered from his injuries.

57.     At the same time, and without even informing Mr. Conroy, he was placed on unpaid FMLA leave.

58.     Based on this, Mr. Conroy's FMLA leave did not begin until August 23, 2021 – after he exhausted his 2-weeks paid vacation and 4 sick days.

59.     Throughout his unpaid FMLA leave, Mr. Conroy remained in regular communications with Delshah, both through his direct manager and through Ms. Grottenthaler, in HR.

60.     Yet, Mr. Conroy was not merely "checking in" with his direct manager and HR.

61.     Instead, he was actually working between 10 to 20 hours a week, performing most of the light duty work that he was denied as a reasonable accommodation.

62.     Any of the time Mr. Conroy spent working that was beyond *de minimus* should have been credited against his 12 weeks of FMLA entitlement.

63.     Because of this, Mr. Conroy still had FMLA eligible in mid-December 2021 because, the hours Mr. Conroy spent performing actual work while on unpaid FMLA leave added between three to five weeks of additional eligible leave.

64.     For example, Mr. Conroy spent working time speaking with porters; checking that buildings were being cleaned and properly maintained; drained a flooded basement; repaired a

broken window; responded to boiler issues, responded daily to tenant emails, text messages, and phone calls related to property management for all fourteen properties; and relayed any information or issues directly to the Company.

65.     Mr. Conroy was also regularly charged with making replacement Mul-T-Lock keys for tenants in the fourteen properties he was responsible. Unlike traditional keys, these keys cannot be easily copied and need a special key order card, which many tenants misplaced or only Mr. Conroy possessed.

66.     Additionally, because Mr. Conroy was the main point of contact for nearly all building vendors, he was regularly called upon for deliveries, maintenance, or other regular building upkeep.

67.     The only regular job duty that Mr. Conroy was not performing because of his injuries was physical maintenance work, but he would remotely, and even in-person, oversee others who were performing such work.

68.     In the time that Mr. Conroy was injured and placed on FMLA leave without his knowledge, Delshah never hired any temporary replacement for Mr. Conroy to take over Mr. Conroy's workload.

69.     Instead, Mr. Conroy was left to continue most of his responsibilities but without any compensation for such work.

**Delshah Terminates Mr. Conroy**

70.     On December 5, 2021, during a regular check-in with his supervisor, Arnaldo Alvarado, and Ms. Grottenthaler, Mr. Conroy discussed extending his leave by a short, and finite, period and returning to work in early January. Specifically, Mr. Conroy discussed, via email, postponing the hip replacement surgery that he needed because of the car accident until a

later date so that he could return to work sooner, albeit with some minor reasonable accommodations for his limp.[1]

71.     In response, Mr. Alvarado and Ms. Grottenthaler told Mr. Conroy that his job was secure, that he should proceed with scheduling the surgery for February, and that he could come back after his recovery from surgery, which was expected to be approximately six to eight weeks.

72.     On these assurances, Mr. Conroy worked with workers compensation and his doctors to try to schedule his hip replacement surgery for early February 2022.

73.     Days later, and without any further discussion or dialogue, Mr. Conroy's received a letter notifying him that he was terminated from Delshah and had until February 15, 2022, to vacate the apartment that Delshah provided for him.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Failure to Pay Overtime Compensation in Violation of the FLSA)

74.     Mr. Conroy repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

75.     From December 2019 to early August 2021 Mr. Conroy regularly worked in excess of forty hours per week.

76.     At all relevant times, Mr. Conroy was an employee and Delshah has been an employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

77.     At all relevant times, Delshah engaged in commerce or in an industry or activity affecting commerce.

78.     Delshah knowingly and intentionally failed to pay Mr. Conroy overtime

---

[1]     While initially Mr. Conroy's accident-related injuries were thought to be limited to his leg and ankle, it was later discovered that because of the accident and his leg injuries, he would also ultimately need hip-replacement.

10

premiums at the rate of one and one-half times his regular rate of pay for each hour worked in excess of forty hours per week in violation of 29 U.S.C. § 201 *et seq.*

79.     By failing to accurately record, report, and/or preserve records of hours worked by Mr. Conroy, Delshah has failed to make, keep, and preserve records with respect to Mr. Delshah sufficient to determine his wages, hours, and other conditions and practices of employment, in violation of the FLSA, 29 U.S.C. § 201, *et seq.*

80.     The foregoing conduct, as alleged, constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C §§ 216(b) and 255(a), and such other legal and equitable relief as the Court deems just and proper.

81.     Due to Delshah's FLSA violations, Mr. Conroy is entitled to recover from Delshah damages in the amount of unpaid overtime compensation, liquidated damages, attorneys' fees and costs, and interest.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Failure to Pay Overtime in Violation of the NYLL)

82.     Mr. Conroy repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

83.     From December 2019 to August 2021, Mr. Conroy regularly worked in excess of forty hours per week.

84.     At all relevant times, Mr. Conroy was an employee and Delshah has been an employer within the meaning of the NYLL.

85.     Delshah knowingly and intentionally failed to pay Mr. Conroy overtime premiums at a rate of one and one-half times their regular rate for each hour worked in excess of forty hours per week in violation of New York Labor Law Article 19, §§ 650 *et seq.* and the supporting regulation of the New York State Department of Labor.

11

86.     By failing to accurately record, report, and/or preserve records of hours worked by Mr. Conroy, Delshah has failed to make, keep, and preserve records with respect to Mr. Delshah sufficient to determine his wages, hours, and other conditions and practices of employment, in violation of the NYLL.

87.     Delshah's failure to pay Mr. Conroy's overtime premiums was willful within the meaning of the N.Y. Lab. Law § 663.

88.     Due to Delshah's NYLL violations, Mr. Conroy is entitled to recover from Delshah damages in the amount of unpaid overtime compensation, liquidated damages, attorneys' fees and costs, and interest.

### AS AND FOR A THIRD CAUSE OF ACTION
### (Failure to Furnish Accurate Wage Statements in Violation of NYLL §195(3))

89.     Mr. Conroy repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

90.     At all relevant times, Mr. Conroy was an employee and Delshah has been an employer within the meaning of the NYLL.

91.     The recordkeeping provisions of Article 19 of the NYLL and its supporting regulations apply to Delshah.

92.     Delshah did not provide Mr. Conroy with a legally sufficient wage statement upon the payment of wages, as required by NYLL § 195(3).

93.     NYLL §195(3) requires that employers furnish employees with wage statements containing accurate, specifically enumerated criteria required under the NYLL.

94.     As a result of Delshah's unlawful conduct, Mr. Conroy is entitled to an award of damages pursuant to NYLL § 198, in an amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by NYLL § 663.

## AS AND FOR A FORTH CAUSE OF ACTION
### (Failure to Furnish Wage Notices in Violation of NYLL §195(1))

95.     Mr. Conroy repeat and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

96.     At all relevant times, Mr. Conroy has been entitled to the rights, protections, and benefits provided under the NYLL.

97.     At all relevant times, Defendant has been an employer within the meaning of the NYLL.

98.     The record-keeping provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendant.

99.     Defendant did not provide Mr. Conroy with wage notices at the start of his employment, as required by NYLL § 195.

100.    NYLL §195 requires that employers furnish employees with wage notices containing accurate, specifically enumerated criteria required under the NYLL.

101.    As a result of Delshah's unlawful conduct, Mr. Conroy is entitled to an award of damages pursuant to NYLL § 198, in an amount to be determined at trial, pre- and post-judgment interest, costs and attorneys' fees, as provided by NYLL § 663.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Interference with FMLA Leave in Violation of the
### Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. ("FMLA"))

102.    Mr. Conroy hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

103.    Mr. Conroy was an "employee" within the meaning of the FMLA.

104.    Delshah was Mr. Conroy's "employer" within the meaning of the FMLA.

105.    Mr. Conroy is, and has been at all relevant times, a qualifying individual who was entitled to FMLA leave.

106.    Delshah is, and has at all relevant times, been a covered employer under the FMLA.

107.    Delshah interfered with Mr. Conroy's right to take FMLA leave by requiring him to work approximately ten to twenty hours per week without compensation when he was supposed to be on leave.

108.    These adverse actions were directly related to Mr. Conroy's exercise and/or attempted exercise of his rights under the FMLA.

109.    Delshah's interference with Mr. Conroy's FMLA leave was willful within the meaning of the FMLA § 2617(a) such that Mr. Conroy is entitled to liquidated damages.

110.    By the actions described above, Delshah, by and through its employees and/or agents, interfered with Mr. Conroy's right to FMLA leave and denied his benefits to which he was entitled under the FMLA.

111.    As a direct result of Delshah's actions, Mr. Conroy has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, liquidated damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## AS AND FOR A SIXTH CAUSE OF ACTION
**(Discrimination in Violation of the New York State Human Rights Law,
N.Y. Executive Law § 290 *et seq*. ("NYSHRL"))**

112.    Mr. Conroy hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

113.    Mr. Conroy was an "employee" within the meaning of the NYSHRL.

114.    Delshah was Mr. Conroy's "employer" within the meaning of the NYSHRL.

115.    Mr. Conroy is, and has been at all relevant times, a qualified individual with a disability and a record of a disability within the meaning of the NYSHRL.

116.    Mr. Conroy is, and has been at all relevant times, otherwise qualified for his position with Delshah; he was, and is, able to perform the essential functions of the position with a reasonable accommodation.

117.    Requesting a temporally defined leave of absence can be a recognized reasonable accommodation.

118.    Delshah's decision to terminate Mr. Conroy for requesting a finite and temporary additional medical leave for recovery and surgery amounts to a discriminatory adverse action motivated by Mr. Conroy's disability.

119.    Delshah knew of Mr. Conroy's disability but nevertheless committed acts of disparate treatment based on discriminatory motive by terminating him.

120.    By the actions described above, Delshah, by and through its employees and/or agents, subjected Mr. Conroy to discrimination in violation of the NYSHRL.

121.    As a direct result of Delshah's actions, Mr. Conroy has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(Failure to Provide Reasonable Accommodation in Violation of**
**the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"))**

122.    Mr. Conroy hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

123.    Mr. Conroy was an "employee" within the meaning of the NYSHRL.

124.    Delshah was Mr. Conroy's "employer" within the meaning of the NYSHRL.

125.    Mr. Conroy is, and has been at all relevant times, a qualified individual with a disability and a record of a disability within the meaning of the NYSHRL.

126.    Mr. Conroy is, and has been at all relevant times, otherwise qualified for his position with Delshah; he was, and is, able to perform the essential functions of the position with a reasonable accommodation.

127.    Even if Mr. Conroy was not qualified under the FMLA, requesting a temporally-defined leave of absence is a recognized reasonable accommodation.

128.    Mr. Conroy sought a reasonable accommodation for his disability by requesting light duty work while recovering, such as desk work, answering emails and phone calls, overseeing vendors or other workers, cutting keys, and directing tenants to resources, and by requesting to have leave for surgery.

129.    Allowing Mr. Conroy to do lighter work would not have been an undue burden on Delshah.  In fact, Delshah had Mr. Conroy doing that work anyway while he was forced to be on unpaid FMLA leave instead of light duty work as an accommodation.

130.    Allowing Mr. Conroy to take additional finite period of leave for surgery would not have been an undue burden on Delshah because Mr. Conroy scheduled the surgery for an exact time in early February, informed Delshah more than a month in advance of the tentative surgery, and gave a clear time for recovery (six to eight weeks after the surgery) after which he would return.

131.    Delshah knew of Mr. Conroy's disability but nevertheless committed acts of disparate treatment based on discriminatory motive by terminating him.

132.     By the actions described above, Delshah, by and through its employees and/or agents, subjected Mr. Conroy to discrimination in violation of the NYSHRL.

133.     As a direct result of Delshah's actions, Mr. Conroy has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**(Failure to Engage in the Interactive Process in Violation of the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"))**

134.     Mr. Conroy hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

135.     Mr. Conroy was an "employee" within the meaning of the NYSHRL.

136.     Delshah was Mr. Conroy's "employer" within the meaning of the NYSHRL.

137.     Since Mr. Conroy was injured, he was an employee with a disability, and thus a member of a protected class within the meaning of the NYSHRL.

138.     Mr. Conroy is, and has been at all relevant times, otherwise qualified for his position with Delshah; he was, and is, able to perform the essential functions of the position with a reasonable accommodation.

139.     Delshah was aware of Mr. Conroy's disability.

140.     Mr. Conroy sought a reasonable accommodation for his disability by requesting light duty work while recovering, such as desk work, answering emails and phone calls, overseeing vendors or other workers, cutting keys, and directing tenants to resources, and by requesting to have a finite period of leave for surgery.

141.    Allowing Mr. Conroy to do lighter work would not have been an undue burden on Delshah.  In fact, Delshah had Mr. Conroy doing that work anyway while he was forced to be on unpaid leave.

142.    Allowing Mr. Conroy to take leave for surgery would not have been an undue burden on Delshah because Mr. Conroy scheduled the surgery for an exact time in early February, informed Delshah more than a month in advance of the tentative surgery, and gave a clear time for recovery (six to eight weeks after the surgery) after which he would return.

143.    Under the NYSHRL, once an employee submits a request to be accommodated, an employer is required to work with an employee to determine an effective accommodation.

144.    Delshah failed to engage in the interactive process, whether formal or informal, to explore options, brainstorm about ideas, or learn more about Mr. Conroy's requests for an accommodation.

145.    Delshah denied requests for light work duty and, later, in essence, denied his finite period of leave for surgery by terminating his employment.

146.    By the acts described above, Delshah, by and through its employees and/or agents, failed to engage in the interactive process in violation of the NYSHRL.

147.    As a direct result of Delshah's actions, Mr. Conroy has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

### AS AND FOR A NINTH CAUSE OF ACTION
**(Retaliation for Requesting a Reasonable Accommodation in Violation of the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq*. ("NYSHRL"))**

148.    Mr. Conroy hereby repeats and re-alleges each and every one of the above

18

allegations as if fully set forth herein.

149.    Under the NYSHRL, it is unlawful for an employer to retaliate against an employee for requesting reasonable accommodation due to disability.

150.    At all relevant times, Mr. Conroy was an "employee" of Delshah under the NYSHRL.

151.    At all relevant times, Delshah was Mr. Conroy's "employer" under the NYSHRL.

152.    Mr. Conroy engaged in protected activity when he requested a reasonable accommodation for his disability.

153.    Delshah was aware of Mr. Conroy's request for accommodation.

154.    Delshah's decision to terminate Mr. Conroy within days of the request for an accommodation amounts to a discriminatory adverse action motivated by Mr. Conroy's status as a member of a protected class.

155.    The temporal proximately of Mr. Conroy's request for an accommodation and his termination establishes a causal connection. See Gorzynski v. Jet Blue Airways Corp., 596 F.3d 93 (2d Cir. 2020) (quoting Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) (casual connection made "by showing that the protected activity was followed closely in time by the adverse employment action.")

156.    By the actions described above, Delshah, by and through its employees and/or agents, subjected Mr. Conroy to retaliation in violation of the NYSHRL.

157.    As a direct result of Delshah' actions, Mr. Conroy has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## AS AND FOR A TENTH CAUSE OF ACTION
### (Disability Discrimination in Violation of the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, §§ 8-107(1)(a)(2))

158.     Mr. Conroy hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

159.     Mr. Conroy was an "employee" within the meaning of the NYCHRL.

160.     Defendant was Mr. Conroy's "employer" within the meaning of the NYCHRL.

161.     Since Mr. Conroy was injured, he was an employee with a disability, and thus a member of a protected class within the meaning of the NYCHRL.

162.     Mr. Conroy is, and has been at all relevant times, otherwise qualified for his position with Defendant.

163.     Delshah knew of Mr. Conroy's disability but nevertheless committed acts of disparate treatment based on discriminatory motive by terminating him.

164.     By the actions described above, Delshah, by and through its employees and/or agents, subjected Mr. Conroy to discrimination in violation of the NYCHRL.

165.     As a direct result of Delshah's actions, Mr. Conroy has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## AS AND FOR A ELEVENTH CAUSE OF ACTION
### (Disability Discrimination – Failure to Accommodate – in Violation of The New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, §§ 8-107(15))

166.     Mr. Conroy hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

167.     Mr. Conroy was an "employee" within the meaning of the NYCHRL.

20

168.    Delshah was Mr. Conroy's "employer" within the meaning of the NYCHRL.

169.    Since Mr. Conroy was injured, he was an employee with a disability, and thus a member of a protected class within the meaning of the NYCHRL.

170.    The NYCHRL, N.Y.C. Admin Code §§ 8-107(15) prohibits employers from refusing to provide a plaintiff a reasonable accommodation for his disability to allow him to perform the essential requisites of his job, so long as Delshah knew of his disability and it would not cause undue hardship on the employer.

171.    Mr. Conroy is, and has been at all relevant times, otherwise qualified for his position with Defendant; he was, and is, able to perform the essential requisites of the position with a reasonable accommodation.

172.    Delshah was aware of Mr. Conroy's disability.

173.    Mr. Conroy sought a reasonable accommodation for his disability by requesting light duty work while recovering, such as desk work, answering emails and phone calls, overseeing vendors or other workers, cutting keys, and directing tenants to resources, and by requesting to have a finite period of leave for surgery.

174.    Allowing Mr. Conroy to do lighter work would not have been an undue burden on Delshah.  In fact, Delshah had Mr. Conroy doing that work anyway while he was forced to be on unpaid leave.

175.    Allowing Mr. Conroy to take leave for surgery would not have been an undue burden on Delshah because Mr. Conroy scheduled the surgery for an exact time in early February, informed Delshah more than a month in advance of the tentative surgery, and gave a clear time for recovery (six to eight weeks after the surgery) after which he would return.

176.    Delshah committed acts of discriminatory practice by failing to reasonably accommodate Mr. Conroy's disability and ultimately terminating him in violation of NYCHRL.

177.    By the actions described above, Delshah, by and through its employees and/or agents, subjected Mr. Conroy to discrimination in violation of the NYSHRL.

178.    As a direct result of Delshah's actions, Mr. Conroy has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

### AS AND FOR AN TWELFTH CAUSE OF ACTION
**(Disability Discrimination – Failure to Engage in the Interactive Process–in Violation of The New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, §§ 8-107(28)(2))**

179.    Mr. Conroy hereby repeats and re-alleges each and every one of the above referenced   allegations as if fully set forth herein.

180.    At all relevant times, Mr. Conroy was an "employee" of Delshah under the NYSHRL.

181.    At all relevant times, Delshah was Mr. Conroy's "employer" under the NYCHRL.

182.    Since Mr. Conroy was injured, he was an employee with a disability, and thus a member of a protected class within the meaning of the NYCHRL.

183.    Mr. Conroy is, and has been at all relevant times, otherwise qualified for his position with Defendant; he was, and is, able to perform the essential requisites of the position with a reasonable accommodation.

184.    Delshah was aware of Mr. Conroy's disability.

185.    At all relevant times, Mr. Conroy requested a reasonable accommodation for his disability that was reasonable within the meaning of the law.

22

186.    Delshah failed to engage in the interactive process, whether formal or informal, to explore options, brainstorm about ideas, or learn more about Mr. Conroy's requests for an accommodation.

187.    Delshah denied requests for light work duty and, in essence, denied his leave for surgery by firing him.

188.    Ultimately, Mr. Conroy was fired specifically for attempting to take a medically necessary leave of absence.

189.    Delshah utterly failed to engage in the interactive process required of them to determine a reasonable accommodation for Mr. Conroy's disability.

190.    By the acts described above, Delshah, by and through its employees and/or agents, failed to engage in the interactive process against Mr. Conroy for requesting an accommodation in violation of the NYCHRL(28)(2).

191.    As a direct result of Delshah's actions, Mr. Conroy has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### (Retaliation in Violation of New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York § 8-107(a)(7)(v))

192.    Mr. Conroy hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

193.    Under the NYCHRL 8-107(7)(v), it is unlawful for an employer to retaliate against an employee for requesting reasonable accommodation due to disability.

194.    At all relevant times, Mr. Conroy was an "employee" of Delshah under the NYCHRL.

195.    At all relevant times, Delshah was Mr. Conroy's "employer" under the NYCHRL.

196.    Mr. Conroy engaged in protected activity when he requested a reasonable accommodation for his disability.

197.    Delshah was aware of Mr. Conroy's request for accommodation.

198.    Delshah's decision to terminate Mr. Conroy within days of the request for an accommodation amounts to a discriminatory adverse action motivated by Mr. Conroy's status as a member of a protected class.

199.    The temporal proximately of Mr. Conroy's request for an accommodation and his termination establishes a causal connection. See Gorzynski v. Jet Blue Airways Corp., 596 F.3d 93 (2d Cir. 2020) (quoting Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) (casual connection made "by showing that the protected activity was followed closely in time by the adverse employment action.")

200.    By the actions described above, Delshah, by and through its employees and/or agents, subjected Mr. Conroy to retaliation in violation of the NYCHRL.

201.    As a direct result of Delshah' actions, Mr. Conroy has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Conroy respectfully requests that the Court enter a judgement and issue:

(a) That Defendant is found to have violated the provisions of the New York Labor Law as to Mr. Conroy;

(b) That Defendant is found to have violated the Fair Labor Standards Act as to Mr. Conroy;

(c) That Defendant's violations as described about are found to be willful;

(d) An award to Mr. Conroy for unpaid wages owed, including interest thereon, and penalties, including liquidated damages, subject to proof at trial;

(e) That Defendant further be enjoined to cease and desist from unlawful activities in violation of the FLSA and NYLL;

(f) An award to Mr. Conroy for his actual damages in an amount to be determined at trial for lost wages and benefits, including an award of back pay and front pay, based on Defendant's violations of the NYSHRL, NYCHRL and FMLA;

(g) An award to Mr. Conroy of compensatory damages in an amount to be determined at trial for the emotional distress sustained as a result of Defendant's violations of the NYSHRL and NYCHRL;

(h) An award to Mr. Conroy of liquidated damages in an amount equal to his award of back pay under the FMLA;

(i) An award of punitive damages to deter future conduct by the Defendant, in an amount to be determined at trial;

(j) An award to Mr. Conroy of the costs of this action, including reasonable attorneys' fees and case expenses to the fullest extent permitted by law, including but not limited to the FLSA, NYLL, NYSHRL, NYCHRL and FMLA;

(k) Statutory fines and interest;

(l)  Such other and further relief, in law or equity, as the Court deems necessary and

proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial

by jury.

Dated: July 8, 2022                    Respectfully submitted,
      New York, New York

                                      ____/s/_____
                                      Rachel M. Haskell, Esq.
                                      Nicholas Bittner, Esq.
                                      The Law Office of Christopher Q. Davis, PLLC
                                      80 Broad St, Suite 703
                                      New York, New York 10004
                                      646-430-7930 (main)
                                      rhaskell@workingsolutionsnyc.com
                                      nbittner@workingsolutionsnyc.com